## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY POLIT,

              Plaintiff,

    v.

GREY FLANNEL AUCTIONS, INC.,

              Defendant.

CIVIL ACTION NO. 3:19-CV-00590

(MEHALCHICK, M.J.)

## MEMORANDUM

Before the Court in this breach of contract and consumer protection law action is a Motion for Summary Judgment filed by the Defendant, Grey Flannel Auctions, Inc. ("Grey Flannel"). (Doc. 48). Grey Flannel moves for summary judgment on Plaintiff Anthony Polit's claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (UTPCPL), as well as on Polit's breach of contract claim. (Doc. 48, at 1). Furthermore, Grey Flannel moves for summary judgment in its favor on its counterclaim against Polit for breach of contract. (Doc. 48, at 1).

I.   **BACKGROUND AND PROCEDURAL HISTORY**

The following background is taken from Grey Flannel's Statement of Facts. (Doc. 49). The Court will note where a fact is in dispute or where the record does not reflect the statement of fact.

Plaintiff Anthony Polit is an adult individual who resides in Scranton, Pennsylvania. (Doc. 49, ¶ 1; Doc. 51, ¶ 1). Polit is a collector of rare sports memorabilia and occasionally sells items for a profit. (Doc. 49, ¶ 2; Doc. 51, ¶ 2). Before the auction at issue in this case, Polit had participated in several other auctions that involved rare and/or collectable sports

memorabilia. (Doc. 49, ¶ 3; Doc. 51, ¶ 3). Polit currently owns approximately 22 rare and collectible sports-related items valued at over five million dollars. (Doc. 49, ¶ 4; Doc. 51, ¶ 4). This collection includes six items that are specifically attributed to Mickey Mantle. (Doc. 49, ¶ 5; Doc. 51, ¶ 5).

Grey Flannel, which has been in operation for approximately 30 years, is a business that offers an internet auction service for personal property, specializing in sports memorabilia. (Doc. 49, ¶ 6; Doc. 51, ¶ 6). Grey Flannel is owned by Richard Russek ("Richard"), his son Michael Russek ("Michael") – who also serves as the Director of Operations – and Michael Rosenbaum, a silent owner. (Doc. 49, ¶ 7; Doc. 51, ¶ 7). As far as its operations are concerned, Grey Flannel enters into consignment agreements with the owner of an item and places that item for auction seeking to sell the item to the highest bidder. (Doc. 49, ¶ 8; Doc. 51, ¶ 8). In terms of Grey Flannel's review of consigned items, it states that its "goal is to offer authentic material."[1] (Doc. 49, ¶ 9; Doc. 49-4, at 22). To generate revenue, Grey Flannel would charge a buyer's premium of up to 20% of the consignment amount. (Doc. 49, ¶ 10; Doc. 51, ¶ 10).

For purposes of attempting to authenticate consigned "elite items," like the item at issue in this case, Grey Flannel would rely on independent research, verifications by the consigner, any letters of opinion that came with the item, and expert reviews. (Doc. 49, ¶ 11;

---

[1] Plaintiff denies this fact but does not provide record support for the denial. (Doc. 51, ¶ 9). Where record support for opposition is lacking, facts are deemed undisputed. *See Goode v. Nash,* 241 F. App'x 868, 869 (3d Cir. 2007) ("[A]lthough the party opposing summary judgment is entitled to 'the benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact,' and 'cannot rest solely on assertions made in the pleading, legal memoranda or oral argument.'") (internal quotations omitted).

Doc. 49-4, at 23-24; Doc. 49-5, at 10). Regarding expert reviews, in 2018, Grey Flannel's primary in-house authentication expert was Nick Coppola. (Doc. 49, ¶ 12; Doc. 49-4, at 24-25, 27). Grey Flannel asserts that Coppola has been involved with reviewing "[a] lot of the true top tier items … over the years." (Doc. 49, ¶ 13; Doc. 49-4, at 27). Grey Flannel would also rely on independent experts at companies like Memorabilia Evaluation and Research Services (MEARS), which specializes in the rating and authentication of sports memorabilia, and "sets the standard for game used authentication within the sports memorabilia arena." (Doc. 49, ¶ 14; Doc. 51, ¶ 14). Once Grey Flannel was satisfied that an item was authentic, Grey Flannel would then photograph the item and list it for bid at an auction through the company's website. (Doc. 49, ¶ 15; Doc. 51, ¶ 15). Furthermore, at the conclusion of the relevant auction, Grey Flannel would send the item to the winning bidder. (Doc. 49, ¶ 15; Doc. 51, ¶ 15).

In or around May 2018, and prior to any involvement by Grey Flannel, an unrelated auction company, Heritage Auctions ("Heritage"), considered auctioning the 1954 Mickey Mantle New York Yankees Game-Used and Autographed Home Pinstriped Flannel Jersey (the "Mantle Jersey"), but declined based on their independent review. (Doc. 49, ¶ 16; Doc. 49-4, at 46-47). Polit adds that Heritage and the jersey's owner had internal struggles with how to accurately list the item. (Doc. 51, ¶ 16; Doc. 52, at 37). After Heritage declined to auction the Mantle jersey, the jersey's owner, Richard Angrist, turned to Grey Flannel to consign the item. (Doc. 49, ¶ 17; Doc. 51, ¶ 17).

Grey Flannel characterizes Angrist as "one of the most well-respected collectors" of sports memorabilia, especially New York Yankees' memorabilia, and had been involved with Angrist in prior transactions. (Doc. 49, ¶ 18; Doc. 49-4, at 40-42). Angrist regularly provides

3

game-used and other baseball memorabilia to the New York Yankees Hall of Fame Museum. (Doc. 49, ¶ 19; Doc. 51, ¶ 19).

In or about 2015, Angrist commissioned a company named MEARS to provide a letter of authenticity for the Mantle Jersey. (Doc. 49, ¶ 20; Doc. 51, ¶ 20). In forming his opinion and rating of the Mantle Jersey, Dave Grob examined the Mantle Jersey's size, manufacturers tagging, construction and style, use and wear signs, and also utilized imagery (or photomatching) analysis. (Doc. 49, ¶ 21; Doc. 49-12, at 3). Grob and MEARS' opinion regarding the Mantle Jersey was that:

> [T]his jersey possesses all the characteristics you would expect to see in a jersey manufactured in the fall of 1953 by Wilson; supplied by McAuliffe and worn by Mickey Mantle in the 1953 World Series as well as the 1954 season. It is assessed as being all original without any alterations or signs of contrived use or wear. To the best of my knowledge and at the time this report was prepared, it is one of two Mickey Mantle New York Yankees jerseys that can be objectively placed to use and wear during a World Series. The other being a 1965 tagged Wilson supplied road jersey that was worn in the 1964 World Series.
>
> The MEARS worksheet and grading criteria provides for 5 categories for which points may be deducted, I found NO reasons to deduct points. As such, the final grade for this jersey bearing hologram #314037 is A10.

(Doc. 49, ¶ 22; Doc. 49-12, at 3-4).

When asked about the degree of certainty and/or assurances that a Letter of Opinion can provide a prospective buyer, Grob stated:

> […] [T]hat degree of certainty belongs to the person who is trying to make a decision on whether or not they wish to buy the uniform or not. From – from my standpoint and how I go about doing my work, I – I list out a series of observations, supporting evidence, and then what opinion it is that I drew from that information.
>
> And I make that available in the body of my work with the idea being that that person who is going to use that work to make an informed decision one way or another sees and considers the things that I did.

(Doc. 49, ¶ 23; Doc. 49-7, at 12).

Also pertaining to the degree of certainty that can be expected of offered "opinions," the listing materials provided by Grey Flannel for the Mantle Jersey advise buyers of the following:

> In very few instances can the provenance of game-used items and autographed items be definitely traced to an athlete or an individual, even when a letter from a team or player is provided. The following paragraphs discuss the processes used by Grey Flannel Auctions to authenticate lots in our auction. As a result of those processes, based on the information available to Grey Flannel Auctions, we are very comfortable in stating that "in our opinion" the items in our auction are authentic. However, every lot in this auction will be sold "As Is," no exceptions.

(Doc. 49, ¶ 24; Doc. 49-10, at 5).

On November 16, 2018, Angrist and Grey Flannel entered into an Auctions Consignment Agreement, under which Angrist consigned the Mantle Jersey to Grey Flannel for auction. (Doc. 49, ¶ 25; Doc. 51, ¶ 25). In part, as required under the terms of the Auctions Consignment Agreement, Angrist "guaranteed" that the Mantle Jersey was "genuine and authentic as represented for consignment." (Doc. 49, ¶ 26; Doc. 49-8, at 3).

Before entering into the Auctions Consignment Agreement, Grey Flannel checked the provenance, including the MEARS Letter of Opinion, researched and drafted by Grob which had been commissioned by Angrist and supplied to Grey Flannel. (Doc. 49, ¶ 27; Doc. 49-4, at 63-65, 69). The MEARS Letter of Opinion states that the Mantle Jersey was examined on February 4, 2015. (Doc. 49, ¶ 28; Doc. 49-12, at 2). When he wrote the opinion for the Mantle Jersey, Grob was employed by MEARS. (Doc. 49, ¶ 29; Doc. 51, ¶ 29). Grob later became employed by SGC in or about 2018. (Doc. 49, ¶ 30; Doc. 51, ¶ 30). The Mantle Jersey was

given an A10 rating by Grob and MEARS. (Doc. 49, ¶ 31; Doc. 51, ¶ 31). A10 is the highest rating that MEARS gives to an item. (Doc. 49, ¶ 32; Doc. 51, ¶ 32). The A10 rating "signif[ies] that, in [MEARS'] professional opinion, the [reviewed] item is extremely likely to be authentic," but not necessarily so. (Doc. 49, ¶ 33; Doc. 51, ¶ 33).

Polit understood that Grob "reflects the [gold] standard" to the extent that, "when an item is sold with his name on it, it brings a value that shows a trend" and maximum value for the consignor. (Doc. 49, ¶ 34; Doc. 49-1, at 14, 27). Polit also believes that a letter of opinion from Grob holds prominence over other letters of opinion in the industry. (Doc. 49, ¶ 35; Doc. 49-1, at 14). Polit's "rule of thumb" was to "always purchase with Dave Grob's letter, and [] do the photo matching if it's not there thereafter," and that he "wouldn't purchase anything without Dave Grob's letter." (Doc. 49, ¶ 36; Doc. 49-1, at 19-21).

As of April 21, 2021, Grob had not seen anything to change his opinion that the Mantle Jersey would be an A10 grade. (Doc. 49, ¶ 37; Doc. Doc. 49-7, at 10). As part of its authentication of the Mantle Jersey, Grey Flannel:

    a.  Looked for exemplars in Grey Flannel's database;

    b.  Looked for possible exemplars sold by other auction houses;

    c.  Searched the internet for possible exemplars;

    d.  Spoke with Heritage "at length," including with the company's Consignment Director, Rob Rosen;

    e.  Spoke with Angrist "at length," including about the issues that Heritage had with the Mantle Jersey;

    f.  Reviewed the MEARS Letter of Opinion;

g. Reviewed the JSA letter of authenticity with regard to the Mickey Mantle signature found on the Mantle Jersey;

h. Discussed the item internally;

i. Discussed the item with outside "experts" in the industry, including Mike Heffner with Newman's Auction House;

j. Physically examined the Mantle Jersey by, among other things, checking its fabric weight, ensuring there were no alterations, ensuring the wear was organic, looking for foreign substances, and examining the calligraphy, sewing structure, and length of stitch;

k. Tracked manufacturer changes from the 1953 regular season through to the 1954 regular season; and

l. Tried to perform its own photomatch.

(Doc. 49, ¶ 38; Doc. 49-4, at 50-51, 54-57, 66-68, 83).

Michael Russek also reviewed the images in the MEARS Letter of Opinion and concluded that the Mantle Jersey could not be photomatched to anything available at the time. (Doc. 49, ¶ 39; Doc. 51, ¶ 39). Grey Flannel was aware that photomatching was simply a "value add," or something that would add to an authenticity determination. (Doc. 49, ¶ 40; Doc. 49-4, at 51, 67). Polit understands that it is not necessary to have a photomatch for a particular item like a game-used jersey as a prerequisite to a finding of authenticity. (Doc. 49, ¶ 41; Doc. 49-1, at 29).

On December 19, 2018, Grey Flannel placed the Mantle Jersey for auction on its website and described the item as a "1954 Mickey Mantle NY Yankees Game-Used & Autographed Home Pinstripe Flannel Jersey (Pristine All-Original Condition, Graded A10

7

by Dave Grob of MEARS Attributing Use to the '53 World Series)." (Doc. 49, ¶ 42; Doc. 49-9, at 2). The item description clearly states that there was no photomatch for the Mantle Jersey. (Doc. 49, ¶ 43; Doc. 49-9, at 2; Doc. 49-1, at 32). Other than the buyer's premium, Grey Flannel had no financial interest in the Mantle Jersey. (Doc. 49, ¶ 44; Doc. 49-4, at 63). Prior to the opening of the auction, Grey Flannel further represented to prospective bidders that:

a.  In its opinion, the Mantle Jersey was genuine and authentic in all respects;

b.  In "very few instances can the provenance of game-used items … be definitively traced to an athlete";

c.  The Mantle Jersey was reviewed for authenticity by Grey Flannel, including Coppola;

d.  The Mantle Jersey was accompanied by a MEARS graded A10 Letter of Opinion;

e.  The Mickey Mantle signature on the Mantle Jersey was deemed authentic by JSA;

f.  Angrist verified the game-use of the Mantle Jersey; and,

g.  The Mantle Jersey would be sold in "as is" condition.

    (Doc. 49, ¶ 45; Doc. 49-9, at 2, 12; Doc. 49-10, at 4-5; Doc. 49-11, at 5).

In part, Grey Flannel's terms of the auction for the Mantle Jersey also provided that:

a.  Grey Flannel could bid on behalf of the consignor and secure increments up to the amount of the reserve, by placing successive bids if necessary;

b.  Successive bids were to be increased by at least 10%;

c.  All winning bids, without exceptions, were to have a 20% buyer's premium added to the final hammer price, to be paid by the winning bidder;

d.  Invoices were to be delivered to the winning bidder in the days following the conclusion of the auction;

e.  The winning bidder was expected to make payment on the invoice "immediately" upon receipt;

f.  The term "photomatched" meant that "an item [was] matched to a photograph of the player using [the] item and/or item ha[d] been researched extensively to specific photos and it cannot be argued that it is not the specific item[; however] [i]t [wa]s [to be] understood that th[at] [wa]s just the opinion of [Grey Flannel's] authenticators and [wa]s not a guarantee";

g.  Each item was "viewed by a minimum of two hobby experts"; and

h.  Prospective bidders could have their experts view auctioned items "prior to the auction."

(Doc. 49, ¶ 46; Doc. 49-10, at 3-5; Doc. 49-11, at 3-5).

Before bidders could bid on the Mantle Jersey, they were required to acknowledge and agree to substantially similar auction rules, terms, and conditions. (Doc. 49, ¶ 47; Doc. 49-11). Likewise, upon placing bids, Grey Flannel construed bidders to have accepted the auction rules, terms, and conditions. (Doc. 49, ¶ 48; Doc. 49-11, at 5). Polit understood that the Mantle Jersey auction was subject to terms and conditions and that he accepted those terms and conditions, despite not having read them. (Doc. 49, ¶ 49; Doc. 49-1, at 39-40). Moreover, the Mantle Jersey was explicitly auctioned "as is." (Doc. 49, ¶ 50; Doc. 49-10, at 3-5). Polit also understood that the auction of the Mantle Jersey was as-is "with all accompanied letters." (Doc. 49, ¶ 51; Doc. 49-1, at 40-41).

Prior to the auction, Polit had been an approved premier bidder with Grey Flannel and reviewed the auction-item description. (Doc. 49, ¶ 52; Doc. 51, ¶ 52). On December 16, 2018, three days before the auction of the Mantle Jersey, Polit also requested Richard to send copies of the MEARS Letter of Opinion. (Doc. 49, ¶ 53; Doc. 51, ¶ 53). On December 17, 2018, Richard sent Polit the MEARS Letter of Opinion and an "Executive Summary," containing Grob's additional notes regarding whether the Mantle Jersey was game-worn by Mickey Mantle. (Doc. 49, ¶ 54; Doc. 49-2, at 3; Doc. 49-14). Grob relied on "[r]esearch and imagery analysis of both still and motion images from [the 1953-1954] period," which reflected upon historical data and information, to conclude that the Mantle Jersey was "worn by … Mickey Mantle during Games 1 and 6 of the 1953 World Series as well as for portions of the 1954 American League regular season." (Doc. 49, ¶ 55; Doc. 49-14, at 2). Polit believed that the ultimate conclusion in the MEARS Letter of Opinion was that the Mantle Jersey was a 1954 unaltered game-used regular-season jersey. (Doc. 49, ¶ 56; Doc. 49-1, at 36). Based solely on the MEARS Letter of Opinion, Polit felt comfortable placing his bids for the Mantle Jersey. (Doc. 49, ¶ 57; Doc. 49-1, at 39, 93).

In addition to reviewing the item description and documents that Richard sent, Polit used a company's photomatching work regarding the Mantle Jersey. (Doc. 49, ¶ 58; Doc. 49-1, at 15-16). The company that Polit used informed Polit that it was unable to photomatch the Mantle Jersey to the 1953 World Series. (Doc. 49, ¶ 59; Doc. 49-1, at 16-17). The company that Polit used also did not give Polit any opinion on the Mantle Jersey in connection with the 1954 regular season. (Doc. 49, ¶ 60; Doc. 49-1, at 16-17).

On December 19, 2018, once the auction on the Mantle Jersey opened, and following Polit's receipt of the MEARS Letter of Opinion and the "Executive Summary," Polit accepted

the terms and conditions of the auction and bid on the Mantle Jersey multiple times. (Doc. 49, ¶ 61; Doc. 49-2, at 3; Doc. 49-1, at 40; Doc. 49-16, at 2-3). Also prior to bidding, Richard spoke with Polit regarding the auction listing for the Mantle Jersey. (Doc. 49, ¶ 62; Doc. 49-4, at 86-87). Polit believed that he was bidding on an authentic 1954 game-used regular-season Mickey Mantle jersey. (Doc. 49, ¶ 63; Doc. 49-1, at 37, 93).

Polit was aware before bidding that the Mantle Jersey was declined by Heritage before Grey Flannel listed the item. (Doc. 49, ¶ 64; Doc. 51, ¶ 64). Polit also knew before bidding that the item had red stitching included on the uniform's label on the front of the jersey. (Doc. 49, ¶ 65; Doc. 49-1, at 59-60; Doc. 49-17, at 2; Doc. 49-9, at 5-6, 10). Polit also admits that he sought adequate assurances from Grey Flannel on December 17, 2018, prior to his placing bids for the Mantle Jersey. (Doc. 49, ¶ 66; Doc. 51, ¶ 66).

On the evening of December 19, 2018, Polit placed the winning (or highest) bid on the Mantle Jersey, in the amount of $497,927.00. (Doc. 49, ¶ 67; Doc. 51, ¶ 67). Polit placed four bids on the item during the course of the auction. (Doc. 49, ¶ 68; Doc. 51, ¶ 68). At no time before bidding on the Mantle Jersey did Polit express concerns to Grey Flannel about the authenticity of the item. (Doc. 49, ¶ 69; Doc. 49-4, at 94).

On December 20, 2018, the day after the auction, Polit received an invoice from Grey Flannel for $580,303.53, which was due to be paid one day later. (Doc. 49, ¶ 70; Doc. 51, ¶ 70). The amount in the invoice represented the final price that Polit was to pay Grey Flannel for the Mantle Jersey. (Doc. 49, ¶ 71; Doc. 51, ¶ 71). Sometime after he received the invoice for the Mantle Jersey, Polit also called Richard to request that 12 pages be removed from the MEARS Letter of Opinion referencing the 1953 World Series and to "tighten up" the MEARS Letter of Opinion "to '54 regular season." (Doc. 49, ¶ 72; Doc. 49-1, at 50-51, 88-89). Polit

11

understood this request would require Dave Grob, MEARS, and/or SGC to re-write the Letter of Opinion. (Doc. 49, ¶ 73; Doc. 49-1, at 51).

On December 26, 2018, Polit e-mailed Richard to threaten that he would not pay the invoice unless he received "solid authentication" of the Mantle Jersey for the 1953 World Series and 1954 regular season. (Doc. 49, ¶ 74; Doc. 49-18). Although not stated in his initial December 26, 2018, email, Polit later states that an individual named JP Cohen told him over the phone that "[t]here were questions regarding the authenticity" of the auctioned item. (Doc. 49, ¶ 75; Doc. 49-1, at 45-49; Doc. 49-18). Polit admits that he was not aware on what basis JP Cohen had made his statement. (Doc. 49, ¶ 76; Doc. 49-1, at 65).

Before he e-mailed Richard on December 26, 2018, Polit had not spoken to anyone other than JP Cohen who might have given Polit any basis of insecurity regarding the authenticity of the Mantle Jersey. (Doc. 49, ¶ 77; Doc. 49-1, at 48-50). Aside from the questions about the authenticity of the Mantle Jersey raised by JP Cohen, Polit's only possible basis for insecurity regarding the authenticity of the Mantle Jersey as of December 26, 2018, was that Grob's new boss at a different company, SGC, would not respond to Polit's post-auction inquiries about having Grob issue a revised letter of opinion. (Doc. 49, ¶ 78; Doc. 49-1, at 65-66, 68-69, 95). Specifically, Polit admits that his concern regarding the Mantle Jersey was related to the lack of response from Grob and SGC and not any objective criteria related to the jersey itself. (Doc. 49, ¶ 79; Doc. 49-1, at 66).

In the end, Polit refused to pay Grey Flannel for the Mantle Jersey because the description in the MEARS Letter of Opinion was not "tightened up" with "additional information." (Doc. 49, ¶ 81; Doc. 49-1, at 88-89, 91). Polit's request for assurances from Grey Flannel was a demand that they provide additional revised letters of authenticity

12

prepared by Grob and/or SGC which would be more consistent with Polit's opinions regarding the Mantle Jersey's prevenance. (Doc. 49, ¶ 82; Doc. 49-1, at 95; Doc. 49-18, at 3-4). Nothing in the contract between Polit and Grey Flannel provided Polit the right to request post-auction verifications or new letter opinions from authentication companies. (Doc. 49, ¶ 83; Doc. 49-11).

Defendant states that in order to reobtain the item, Angrist ultimately paid Grey Flannel $86,000.00, Angrist testified that he paid Grey Flannel $75,000. (Doc. 49, ¶ 84; Doc. 49-4, at 92, 96-97; Doc. 49-6, at 41-42). To date, Polit has not paid Grey Flannel anything towards his winning bid on the Mantle Jersey. (Doc. 49, ¶ 85; Doc. 49-1, at 44). Defendant states that taking the amount Angrist paid Grey Flannel to be $86,000 and the buyer's premium that Polit owed based on his winning bid to be $95,985.40, the amount due to Grey Flannel remains $9,985.40. (Doc. 49, ¶ 86; Doc. 1-2, at 6). Taking the record evidence that Angrist paid Grey Flannel $75,000, the amount due to Grey Flannel would remain $20,985.40. (Doc. 49-6, at 42; Doc. 1-2, at 6). Polit has not purchased any replacement or like item. (Doc. 49, ¶ 87; Doc. 49-1, at 85). Polit testified at his deposition that he does not have any information to support his suggestion that Grey Flannel was aware that the Mantle Jersey was not an authentic item at the time they put it up for auction. (Doc. 49, ¶ 88; Doc. 49-1, at 62).

As the motion has been fully briefed, it is now ripe for review. (Doc. 50; Doc. 52).

II.  **STANDARD OF REVIEW**

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might

13

affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

A federal court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000). The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, the court's function is not to make credibility determinations, weigh evidence, or draw inferences from the facts. *Anderson*, 477 U.S. at 249. Rather, the court must simply "determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249.

"Although the party opposing summary judgment is entitled to the 'benefit of all factual inferences in the court's consideration of a motion for summary judgment, the nonmoving party must point to some evidence in the record that creates a genuine issue of material fact.'"[2] *Goode,* 241 F. App'x at 869. The opposing party "cannot rest solely on

---

[2] *See also Beenick v. LeFebvre*, 684 F. App'x 200, 206 (3d Cir. 2017) (stating the purpose of requiring parties to cite to particular parts of the record in their briefs about a motion

14

assertions made in the pleadings, legal memorandum, or oral argument." *Goode,* 241 F. App'x at 869 (internal quotation marks omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).

III.   **DISCUSSION**

In this motion, Grey Flannel asserts that it cannot be held liable for breach of contract, nor can Polit maintain a private right of action under the UTPCPL, as a matter of law. (Doc. 50, at 7). Rather, Grey Flannel avers that Polit is undisputedly liable to it for breach of contract. (Doc. 50, at 7). Polit contends that there are genuine issues of material fact as to his standing to bring a UTPCPL claim, as well as to whether Defendant's acts were unfair and deceptive. (Doc. 52, at 5). Additionally, Polit states that he had a reasonable basis for the questions he raised regarding the Mantle Jersey, thus summary judgment should be denied as to Defendant's breach of contract claim. (Doc. 52, at 5). Finally, Polit avers that summary judgment for Defendant should be denied because Grey Flannel cannot satisfy all of the required elements of a breach of contract claim and its damages were self-inflicted. (Doc. 52, at 5).

A.   POLIT'S UTPCPL CLAIM

Grey Flannel asserts that to bring a private action under the UTPCPL the claimant must either purchase or lease goods or services, and because Polit did neither he does not

---

for summary judgment is to "assist the court in locating materials buried in a voluminous record") (quoting Fed. R. Civ. P. 56(c)(1)(A)).

have standing to bring such a claim. (Doc. 50, at 13-15). Furthermore, "ascertainable loss" must have occurred to bring a claim under the UTPCPL and Polit's damages are speculative rather than ascertainable, according to Grey Flannel. Finally, Grey Flannel submits that Polit admits to having no proof that Grey Flannel engaged in unfair or deceptive acts before or during the auction. (Doc. 50, at 16-18).

Polit asserts that the UTPCPL is to be construed broadly and that he "was fully prepared to purchase and take possession of the Mickey Mantle jersey until concerns about its authenticity were raised." (Doc. 52, at 10). Since Polit placed the highest bid for the jersey, he "was entirely prepared to be a purchaser of the Mickey Mantle Jersey." (Doc. 52, at 11). Polit argues that this preparation, along with the liberal application of the UTPCPL, means that a genuine issue of material fact exists as to whether he holds standing. (Doc. 52, at 11). Furthermore, Polit states that he suffered ascertainable loss in the form of "the lost opportunity to own an important and rare piece of baseball memorabilia." (Doc. 52, at 13). Grey Flannel's allegedly deceptive acts included not following its own specific policies with regard to the auction, as well as listing the jersey as worn in 1954 when the jersey's owner did not believe it was worn in that year. (Doc. 52, at 13-16).

### 1. Plaintiff lacks standing because he is not a purchaser or lessee under the UTPCPL

First, as this Court sits in diversity jurisdiction, it must apply Pennsylvania substantive law. *See Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938). In order to bring a private UTPCPL action, the plaintiff must prove that he or she is a "purchaser" who lost money or property as

a result of unfair trade practices. 73 Pa. Stat. §§ 201–9.2 and 201-3.[3] A plaintiff need not be in direct privity with a defendant to have standing under the UTPCPL. *See Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 56 (3d Cir. 1992). However, standing does not extend to a party who made no purchase. *Gemini Physical Therapy and Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1994) (citation omitted). To have standing, the claimant must have "made a 'purchase[.]'" *Car Sense, Inc. v. American Special Risk, LLC*, 56 F. Supp. 3d 686, 697 (E.D. Pa. 2014) (citing *Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.*, 574 A.2d 641, 645 (Pa. Super. Ct. 1990)).

A purchaser does not yet exist when money has not been exchanged and a good or service has not been received. The Pennsylvania Superior Court has relied on the Webster's Dictionary to define the term "Purchaser" for purposes of the UTPCPL: "one that purchases: … one that acquires property for a consideration (as of money): BUYER, VENDEE…." *Defazio v. Gregory*, 836 A.2d 935, 939 (Pa. Super. Ct. 2003) (quoting *Webster's Third New Int'l Dictionary* 1845 (1976)). "A plaintiff who seeks to enter into a contract for purchase but fails to do so may not bring a claim under the UTPCPL, even where the plaintiff is prevented from making the purchase by the defendant's allegedly fraudulent conduct." *Wise v. American General Life Ins. Co.*, 459 F.3d 443, 452 (3d Cir. 2006). In *Wise*, a life insurance applicant completed, signed, and delivered an application for life insurance, and the insurance company issued the policy and mailed it to the applicant with a note saying, ""[t]his policy is your contract and is for you to keep with other important documents." *Wise*, 459 F.3d at 445-46. The policy contained a "date of issue" of March 3, 2004 – seven days before the applicant

---

[3] The UTPCPL also applies to lessees, however Polit does not assert that he was a lessee. (Doc. 52, at 9-11).

received the policy in the mail – which was described as the date when the policy year began. *Wise*, 459 F.3d at 446. The application submitted by the applicant stated that no insurance would be in effect until the first premium is paid, and the policy mailed to the applicant stated that insurance would not take effect until the first premium is paid. *Wise*, 459 F.3d at 445-46. On the day he received the policy in the mail, the applicant died of a heart attack. *Wise*, 459 F.3d at 446. When faced with a claim under the UTPCPL, the Third Circuit characterized the situation as one where the plaintiff "[sought] to enter into a contract for purchase but fail[ed] to do so[.]" *Wise*, 459 F.3d at 452. The applicant did not purchase the life insurance policy, according to the Third Circuit, and so the UTPCPL claim was dismissed. *Wise*, 459 F.3d at 452.

Here, just as in *Wise*, Polit came as close as he could to purchasing the Mantle Jersey but did not complete the purchase. In *Wise*, the insurance application was completed and the policy was mailed to the applicant. *Wise*, 459 F.3d at 445-46. Here, Polit placed the winning bid. (Doc. 49, ¶ 67; Doc. 51, ¶ 67). The application signed by the applicant in *Wise* stated that the policy would take effect only upon receipt of the first premium. *Wise*, 459 F.3d at 445-46. Here, the contract agreed to by Polit states that items could be retrieved from Grey Flannel "after funds have cleared." (Doc. 49-10, at 4; Doc. 49-11, at 5). This indicates that the purchase is not complete when funds have not yet cleared. As in *Wise*, Polit did not pay any money therefore he failed to make the purchase. (Doc. 49, ¶ 85; Doc. 49-1, at 44); *see Wise*, 459 F.3d at 452.

The Court can find no controlling legal authority in Pennsylvania stating that the UTPCPL extends to those who prepare to make a purchase, and Polit cites to no

18

Pennsylvania law saying so. (Doc. 52, at 9-11). As such, Polit lacks standing to bring a UTPCPL claim and that claim shall be **DISMISSED.**

### B.  Polit's Breach of Contract Claim

Grey Flannel asserts that it is entitled to summary judgment on Polit's breach of contract claim because it was ready to deliver the Mantle Jersey to Polit upon Polit's payment in accordance with the auction's terms and conditions. (Doc. 50, at 19). It is undisputed that Polit failed to fulfill his obligation to provide payment, according to Grey Flannel. (Doc. 50, at 19). As such, Grey Flannel avers that a common law breach of contract claim must fail as a matter of law. (Doc. 50, at 19). Grey Flannel also asserts that Polit lacked reasonable grounds for insecurity so as to allow for a request for adequate assurances under the Uniform Commercial Code (UCC). (Doc. 50, at 19).

Polit submits that the information he gathered after placing the highest bid gave him reasonable grounds to request assurances from Grey Flannel that it would sufficiently perform its end of the bargain. (Doc. 52, at 18). Polit states that he and Grey Flannel contracted for the Mantle Jersey at a specific price point, Grey Flannel breached its duty to provide assurances after Polit had reasonable ground to question the validity of the jersey, and Polit was damaged by being deprived of the Mantle Jersey. (Doc. 52, at 19). According to Polit, since a genuine issue of material fact exists as to whether the assurances Polit requested were reasonable, summary judgment in favor of Grey Flannel is not appropriate. (Doc. 52, at 19-20).

The UCC states that,

[a] contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either

party the other may in writing demand adequate assurance of due performance and until that party receives such assurance may if commercially reasonable suspend any performance for which that party has not already received the agreed return.

U.C.C. § 2-609(1); *accord* 13 Pa. Const. Stat. § 2609(a).

Commercial standards, rather than legal, are used to define "reasonable grounds" and "adequate assurance." 13 Pa. Const. Stat. § 2609(b). The insecurity need not arise from or directly relate to the contract itself. *Brisbin v. Superior Valve Co.*, 398 F.3d 279, 286 (3d Cir. 2005) (13 Pa. Const. Stat. § 2609(b) Comment 3). The determination of whether reasonable grounds for insecurity exist or adequate assurance of due performance are provided "are generally questions of fact, but may sometimes be decided as a matter of law." *Brisbin*, 398 F.3d at 285.

"Any facts which should indicate to a reasonable merchant that the promised performance might not be forthcoming when due should be considered reasonable grounds for insecurity." *Diskmakers, Inc. v. DeWitt Equip. Corp.*, 555 F.2d 1177, 1179 (3d Cir. 1977). For reasonable grounds for insecurity to exist, "there must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform." *Top of Iowa Co-op. v. Sime Farms, Inc.*, 608 N.W.2d 454, 466 (Iowa 2000) (citing R.J. Robertson, Jr., *The Right to Demand Adequate Assurance of Due Performance: Uniform Commercial Code Section 2-609 and Restatement (Second) of Contracts Section 251,* 38 Drake L. Rev. 305, 322 (1988-89)). A buyer may have reasonable grounds for insecurity when "goods like those contracted for but delivered to other buyers fail to work as anticipated[.]" 1 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE § 7:4 (6th ed. 2020). Reasonable grounds for insecurity also include the buyer's discovery that the seller is making deliveries of

defective items to others, discovery that the seller has a shortage of parts in its warehouse, buyer's receipt of flawed prototypes, and receipt of defective items as part of an installment contract. *See T & S Brass & Bronze Works, Inc. v. Pic-Air, Inc.*, 790 F.2d 1098, 1105 (4th Cir. 1986) (applying South Carolina law); *AMF v. McDonald's Corp.*, 536 F.2d 1167, 1170 (7th Cir. 1976) (applying Illinois law); *LNS Inv. Co. v. Phillips*, 731 F. Supp. 1484, 1487 (D. Kan. 1990) (applying Kansas law); *Creusot-Loire International, Inc. v. Coppus Engineering Corp.*, 585 F. Supp. 45, 49 (S.D.N.Y. 1983) (applying New York law).

In every case where reasonable grounds for insecurity could exist, the buyer identifies an objective and concrete reason involving a quality of the good or actions of a party. "[T]he drafters of the code did not intend that one party to a contract can go about demanding security for the performance of the other whenever he gets nervous about a contract. Some reason for the demand for assurance must precede the demand." *Cole v. Melvin*, 441 F. Supp. 193, 203 (D.S.D. 1977).

Here, there was no objectively factual basis for Polit's insecurity. It is undisputed that Polit's reason for insecurity arose from a phone call with JP Cohen, who told him over the phone that "[t]here were questions regarding the authenticity" of the auctioned item. (Doc. 49, ¶ 75; Doc. 49-1, at 45-49; Doc. 49-18). It is also undisputed that Polit had no knowledge of the basis for JP Cohen's statement. (Doc. 49, ¶ 76; Doc. 49-1, at 65). Besides Cohen's statement, Polit's only possible basis for insecurity regarding the authenticity of the Mantle Jersey at the time he requested assurance was that his post-auction inquiries to Grob and Grob's employer were met with no response; there was no objective criteria related to the jersey itself. (Doc. 49, ¶ 79; Doc. 49-1, at 66). If Polit had been aware of the basis for Cohen's statement perhaps he would have had an objectively factual basis for his insecurity. *See*

*Creusot-Loire International, Inc.*, 585 F. Supp. at 49 (recognizing that a buyer has reasonable grounds for insecurity if he discovers that the seller is making defective deliveries to others). The presence of "questions" regarding the authenticity of the jersey – with no knowledge of why those questions exist – constitutes subjective nervousness rather than an objective factual basis. It follows that Grob's lack of response to Polit's post-auction inquiries arising from those questions cannot be considered an objective factual basis for reasonable insecurity. *See* (Doc. 49, ¶ 79; Doc. 49-1, at 66).

Polit had no reasonable grounds for insecurity upon which to demand adequate assurances. (Doc. 49, ¶¶ 75, 76, 79; Doc. 49-1, at 45-49, 65-66; Doc. 49-18); *see* 13 Pa. Const. Stat. § 2609(a); *Top of Iowa Co-op.*, 608 N.W.2d at 466 ("[T]here must be an objective factual basis for the insecurity, rather than a purely subjective fear that the party will not perform."). As such, Grey Flannel is **GRANTED** summary judgment on Polit's breach of contract claim.

### C.   GREY FLANNEL'S BREACH OF CONTRACT CLAIM

Grey Flannel asserts that it is entitled to summary judgment on its counterclaim against Polit for breach of contract. (Doc. 50, at 26-27). According to Grey Flannel, Polit was obligated to pay a "buyer's premium" as the highest bidder, which reflected the profit Grey Flannel was to receive on the bid. (Doc. 50, at 26). Grey Flannel submits that Polit paid none of the invoiced amount and so, accounting for Grey Flannel's mitigation of damages, owes the balance of the profit Grey Flannel was to make on the Mantle Jersey. (Doc. 50, at 26-27).

Polit contends that "Defendant did not follow their own policies and procedures when dealing with the consignment and eventual auction of a product, causing any damages to be the result of their own actions." (Doc. 52, at 20). According to Polit, one of Grey Flannel's employees placed a bid on the Mantle Jersey without Michael Russek's awareness, in

violation of Grey Flannel policy. (Doc. 52, at 21-22). Furthermore, Grey Flannel did not offer the Mantle Jersey to the underbidder after Polit refused to pay, instead offering it to the original owner. (Doc. 52, at 20-21). This, too, allegedly went against Grey Flannel policy. (Doc. 52, at 21).[4]

Under Pennsylvania law, a breach of contract claim is proven upon establishing (1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). "A sale by auction is complete when the auctioneer so announces by the fall of the hammer or in other customary manner." U.C.C. § 2-328(2). When an auction winner is announced, an irrevocable contract is formed as a matter of law. *Cedyco Corp. v. PetroQuest Energy, LLC*, 497 F.3d 485, 488 (5th Cir. 2007) (citing *Moss v. Hudson & Marshall, Inc.,* 599 S.E.2d 279, 281 (Ga. 2004)). Polit does not argue that a contract was never formed, rather he submits that Grey Flannel's violation of its own policies resulted in its damages. (Doc. 52, at 20-23).

Under Pennsylvania law, "a material breach by one party to a contract entitles the non-breaching party to suspend performance." *Falls v. State Farm Ins. Mut. Auto. Ins. Co.*, 774 F. Supp. 2d 705, 711 (M.D. Pa. 2011) (quoting *Widmer Eng'g, Inc. v. Dufalla,* 837 A.2d 459, 467 (Pa. Super. Ct. 2003)). "If a breach constitutes a material failure of performance, then the non-breaching party is discharged from all liability under the contract." *Falls*, 774 F. Supp. 2d at 711 (quoting *Widmer Eng'g, Inc.*, 837 A.2d at 467). Polit submits two instances of "deceptive

---

[4] As discussed *supra*, Grey Flannel was not obligated to provide adequate assurances, thus Grey Flannel's lack of assurance does not rationalize any potential breach of contract on the part of Polit. *See* (Doc. 52, at 20, 22).

actions" which purportedly allow for discharge of Polit's liability. (Doc. 52, at 20-22). First, Polit asserts that one of Grey Flannel's employees bid on the Mantle Jersey, an occurrence that is an "infrequent event" and which the employee must receive "clearance" to perform. (Doc. 52, at 21). Polit states that Michael Russek was unaware of his employee placing such bids, so it was "problematic." (Doc. 52, at 21-22). However, Grey Flannel's terms and conditions – agreed to by Polit when he placed the bid – are clear that "[Grey Flannel] reserves the right to bid on any lot which it feels is below market and a sound financial investment." (Doc. 49-10, at 3; Doc. 49-11, at 3). Furthermore, there is no mention of Grey Flannel employees being barred from placing bids in the terms and conditions, and Michael Russek testified that Nick had his "expressed permission" to place such a bid. (Doc. 49-4, at 81-82; Doc. 49-10; Doc. 49-11) As such, this conduct does not constitute a material breach on the part of Grey Flannel and does not allow Polit to suspend or discharge his obligation. *See* (Doc. 49, ¶ 49; Doc. 49-1, at 39-40) (it is undisputed that Polit accepted Grey Flannel's terms and conditions upon bidding on the Mantle Jersey). The second "deceptive action" alleged by Polit was Grey Flannel offering the Mantle Jersey to Angrist rather than to the underbidder. (Doc. 52, at 20-22). Since this undisputedly occurred after Polit refused to answer Grey Flannel's invoice, it cannot now be used by Polit as reason to suspend or discharge his obligation. (Doc. 49, ¶¶ 70, 71, 84; Doc. 51, ¶¶ 70, 71; Doc. 49-4, at 92, 96-97; Doc. 49-6, at 41-42).

Grey Flannel's offer of the Mantle Jersey to Angrist rather than to the underbidder could constitute a failure to mitigate damages. To prove a failure to mitigate, Polit must show "(1) what reasonable actions the plaintiff ought to have taken, (2) that those actions would have reduced the damages, and (3) the amount by which the damages would have been

reduced." *See Prusky v. ReliaStar Life Ins. Co.*, 532 F.3d 252, 258-59 (3d Cir. 2008). The facts and circumstances of each individual case at the time the problem was presented are used to determine the reasonableness of the plaintiff's actions. *Prusky*, 532 F.3d at 259. Any unmitigated damages are not chargeable to the defendant. *Prusky*, 532 F.3d at 259.

A review of the actions taken by Grey Flannel show that damages would not have been mitigated had the Mantle Jersey been offered to the underbidder. The record shows that Angrist paid Grey Flannel at least $75,000 to re-acquire the Mantle Jersey. (Doc. 49, ¶ 84; Doc. 49-4, at 92, 96-97; Doc. 49-6, at 41-42). The next-highest bid other than Polit's was in the amount of $297,995. (Doc. 49-16). The 20% buyer's premium which Grey Flannel would have collected on this bid would have netted Grey Flannel $59,599.[5] *See* (Doc. 49-11, at 3; Doc. 49-16). The record indicates that Grey Flannel received more from Angrist than it would have from offering the Mantle Jersey to an underbidder, thus Polit fails to sustain his burden of proving that Grey Flannel failed to mitigate. *See Prusky*, 532 F.3d at 258.

The record establishes that Grey Flannel and Polit agreed to a sale of the Mantle Jersey and that Polit breached this contract by refusing to pay the agreed-upon amount. (Doc. 49, ¶¶ 67, 70, 85; Doc. 51, ¶¶ 67, 70; Doc. 49-1, at 44). The amount of money lost by Grey Flannel as a result of Polit's breach was, at a minimum, $9,985.00.[6] (Doc. 49, ¶ 86; Doc. 1-2, at 6). As such, Grey Flannel establishes without dispute of material fact that Polit breached his contract

---

[5] Other than the buyer's premium, Grey Flannel had no financial interest in the Mantle Jersey. (Doc. 49, ¶ 44; Doc. 49-4, at 63).

[6] Angrist testified at his deposition that he paid Grey Flannel $75,000 for the Mantle Jersey, while Grey Flannel submits that they were paid $86,000. (Doc. 49, ¶ 84; Doc. 49-4, at 92, 96-97; Doc. 49-6, at 41-42). If Grey Flannel received less than $86,000 from Angrist, then damages would be higher.

with Grey Flannel. *See Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C.*, 137 A.3d at 1258.

Grey Flannel shall be **GRANTED** summary judgment on its breach of contract claim against

Polit.

IV.   **CONCLUSION**

For the reasons set forth herein, Grey Flannel's Motion for Summary Judgment shall

be **GRANTED.** (Doc. 48). Judgment shall be entered in Grey Flannel's favor and against

Plaintiff Anthony Polit in the amount of $9,985.00.

An appropriate order follows.


**Dated: October 18, 2021**                                        *s/ Karoline Mehalchick*
                                                                    **KAROLINE MEHALCHICK**
                                                                    **United States Magistrate Judge**